# Exhibit A



The Chief Constable in Holstebro
The Public Prosecutor for Serious Economic Crime

# Case Summary

### as on 1 November 2001

in SAØK 278/00

The Court in Ringkøbing SS 1.221/2001

**The Public Prosecutor**

**v.**

**Mogens Amdi Pedersen et al.**

## 1. Introduction

The charges in this case concern embezzlement and tax fraud to amounts of approx. DKK 75 m and DKK 111 million, respectively, for a number of transactions in "*The Foundation for the Support of Humanitarian Purposes, the Promotion of Research, and the Protection of the Natural Environment*" (hereinafter called "the Foundation").

A number of contributors have paid approx. DKK 70 m to the Foundation, which – being approved as a humanitarian organisation cf. section 12(3) of the Danish Tax Assessment Act – may receive contributions with tax benefit for the contributors. The objects clause of the Foundation corresponds exactly to the formulation of section 12(3) of the Tax Assessment Act. This means that the Foundation may legally (in relation to the Tax Assessment Act and to the objects of the Foundation itself) allocate funds only to purposes of public utility, which at the same time are in the nature of "humanitarian" purposes, purposes of "promotion of research", or "protection of the natural environment".

The Foundation has not paid tax of the amounts received, as these have allegedly been allocated for purposes of public utility. For such allocations deductions are made in the tax accounts of the Foundation, cf. section 4 of the Danish Taxation of Foundations Act. In the period 1987-2000 a total of approx. DKK 100 m has been provided and allocated, which has given the Foundation tax deductions to the same amount.

In September 2000 the Chief Constable in Holstebro decided to commence an investigation of the activities of the Foundation. This was done in cooperation between the Holstebro police and the Public Prosecutor for Serious Economic Crime, Copenhagen. In March 2001 the Chief Constable decided to charge four persons, **Mogens Amdi Pedersen, Poul Jørgensen, Bodil Ross Sørensen,** and **Eva Vestergaard.**

On the background of a number of decisions by the Court in Ringkøbing, a coordinated police action was carried out on 25 April, 2001 against eight addresses in Denmark, while

documents were also obtained from a number of third parties and corporations, including Citibank, Miami, USA.

At the police action 70 computers were seized, 16 of which were equipped with the advanced encryption program "Safeguard Easy". A large part of the documents in the computers were encrypted with other programs. None of the defendants or the users of these computers (except one) were willing to state the password for the computers.

During the summer and autumn of 2001 the police technicians managed to make part of the material in the secured computers readable, and in October 2001 it became possible to make a systematic search in the material, which is very extensive.

## 2. Summary

The investigation in the period between April 2001 and October 2001 has revealed

**that** all contributors are members of the inner circle of the Tvind organisation, which is a hierarchically built association with clear political aims, headed above all by the defendant Mogens Amdi Pedersen, the defendant, and that the defendants control the private economy of the contributors, which is managed by the defendants or their assistants,

**that** the Foundation is not managed by an independent board of directors, but that *de facto* the defendants control the funds paid to the Foundation,

**that** – to the extent described below - the Foundation has made no allocations to public utility (humanitarian, etc.) purposes, but to commercial enterprises (enterprises and institutions), which are controlled by the defendants and where the profit of the enterprise accrued to the defendants. In addition, allocations have been made to enterprises or individuals whom the defendants have decided to favour, all in order to procure for themselves directly or indirectly an unwarranted gain – or to procure unwarranted gains for the chosen third parties,

**that** it has been attempted to conceal these unwarranted allotments from the foundation authority in Denmark (The Ministry of Justice, Department of Private Law), the defendants having prepared or caused to be prepared incorrect applications for support and incorrect reports on the use of the funds of the Foundation, and the defendants have also made seemingly independent associations apply for support, where in fact these associations were controlled by the defendants and created for the purpose,

**that** the defendants – until further to the extent described below - have thereby committed an offence under section 278 of the Danish Criminal Code by misappropriating funds earmarked for public utility (humanitarian) purposes,

**that** the tax authorities – on the basis of the defendants' incorrect, incomplete or misleading information – have each year approved the Foundation as a recipient of tax-privileged contributions, and that the tax authorities have mistakenly approved the deductions made in the annual tax returns under the pretext that allocations have been made to public utility purposes, which – still to the extent that this has been described until further in the following - is punishable as tax fraud, cf. section 13 of the Danish Tax Control Act.

The circumstances of the case are the following:

## 3. The Tvind Teacher Group ("Lærergruppen"- LG)

### 3.1 The activities of the Teacher Group

Around 1970 a group of teachers who opposed the establishment in Denmark formed a community around a folk high school. The leader of this group was Mogens Amdi Pedersen. From this beginning a worldwide organisation developed, colloquially called "Tvind" (with reference to the locality where the organisation was first established).

Via the liberal Danish school legislation, which ensures public financial support to private schools, the group founded a large number of schools in the period after 1971. At the same time the group, which had come to comprise approx. 3-400 persons with a common ideological conviction, built up a network of institutions and enterprises, which today count schools in Denmark and abroad, factories, plantations, farms and shops, recycling organisations and other enterprises in more than 55 countries.

According to the school association's own publication "Skoleerfaringer" (School Experience) from 1988, the association was based on the idea that all teachers in Tvind were organised in a tight community, colloquially "Lærergruppen" – LG (The Teacher Group).

The Teacher Group is formed on three basic principles: Collective economy, collective time, and collective distribution. "**Collective economy**" means, among other things, that the teachers transfer all their available income to joint savings, while for their own requirements they receive food, lodgings, and pocket money from the community. "**Collective time**" means that the members of the LG are available to the community and that to a certain extent they forgo their personal rights, such as the right to start a family according to their own wish. "**Collective distribution**" means that the community decides where the LG members are to work and what they are to work with. In practice this is decided by the "Distribution Group", in casu Mogens Amdi Pedersen and Kirsten Larsen or the persons appointed by these two.

The police material demonstrates that LG's activities in the period 1992-2001 had expanded far beyond pure school activities. In 1992 the organisation had the following productive activities:

- LG's schools in Denmark, divided into a number of sub-groups: Continuation schools, Free
  Schools, etc. In 2001 a total between 45 and  50 schools.
- LG's schools abroad, especially in Scandinavia and Africa,
- The University of the Seven Seas (USS), LG's plantations and properties abroad,
- LG's merchants, i.e. shops and wholesalers for the sale of among other things recycled clothes in a number of countries,
- LG's factories, including among other things manufacture of shoes in Morocco,
- the Federation UFF/Humana. In 1977 LG established the relief agency Ulandshjælp fra Folk til Folk (UFF) (Development Aid among the Peoples), which collects second-hand clothes in Denmark and – under a number of other names – in a large number of European countries. In the United States the clothes are collected under the name of "USAgain". The international superstructure on UFF is "Humana, People to People", which is managed from Denmark and from the new headquarters of the organisation in Zimbabwe under the name of "Federationen". UFF/Humana works in Africa under the name of DAPP, in other places ADPP.

- LG's project ventures, plantations, farms, sawmills and other enterprises in a large number of countries, especially in Asia, Central and South America,
- LG's enterprises, including a number of foundations in Denmark and abroad.

These activities are still being exercised, cf. Exhibit 56-3-1-7 pp. 25-34, which is an undated list of 262 "LG Projects", found on a secured computer from Odinsvej, Grindsted (Exhibit No. D-1-26-04, tab 42 in the dossier).

### 3.2. The income of the organisation

In the initial period (1970-1980) the income of the organisation consisted primarily of grants from the Danish Government, including salaries to teachers of the Free Schools and abroad. Today the Tvind group is financially independent of grants from the Danish Government, etc., which in 1996-1999 stopped the public support to the Tvind schools in Denmark.

In 1992-1993 (and presumably correspondingly today) the income to the teacher group came from a large number of sources, cf. tab 33 in the dossier, among others:
- interest on the capital,
- wage income from employment in Denmark and abroad,
- income from container leasing,
- income from ship leasing in Denmark and abroad,
- income from the sale of clothes under Handelshuset,
- income from operation of factories in Morocco,
- income from fruit trade,
- income from projects financed by Tvind's Humanitarian Foundation, including IFAS and La Societé Verte,
- income from leasing of properties in Denmark and abroad,
- income from sale of LG's property,
- income from enterprises in USS, i.e. LG's plantations and farms,
- income from production of and trade with containers.

Like the documents mentioned below, this document has been found at searching at **Sten Byrner**, who in the period 1987 –1992 was centrally placed in the organisation. It appears from the dossier, tabs 1, 2 and 3, , that in 1992 Mogens Amdi Pedersen decided to organise "LG's Treasury", i.e. the financial structure in the Tvind Group, via a network of bank accounts. These bank accounts are owned by companies placed in tax havens, cf. immediately below.

It **appears** from Amdi Pedersen's plan for the "basic structure of the total economy" (the dossier, **tab** 7), that the final control of the economy in Tvind lies with "*our office, which decides Itself its relations to entrepreneurs, principal formations, the divisions of the total economy, and to Marlene and Ruth*" cf. below about this document. By way of conclusion it appears from the documents mentioned and from Amdi Pedersen's letter dated 22 June 1995 (placed under tab 42) that the objective of designing LG's treasury is to ensure that "*the funds are placed so that at any time they are available to us, that they are never available to others, that they are protected from theft, taxation, and prying by unauthorised persons, that the joint ownership is ensured*" (tab 3), and to "*lay down a twisted access path with only ourselves as compass holders*" (tab 42).

The documents just mentioned describe the organisation plan in Tvind as per 1992. This plan has since been implemented. This is demonstrated by Exhibit 56-6-14 (tab 43), which is a comprehensive survey of the construction of the Tvind Group as per 1 September 1995. The Group diagrams have been found in one of the secured computers, Evidence Exhibit E-

14-8-1. The survey comprises more than one hundred companies and foundations, where the holding companies are placed in typical tax haven countries, and where the recurring persons in the central companies seem to be **Kirsten Larsen, Anne Hansen, Else Jensen, Birgitte Krohn, Svend Sørensen**, and **Joep Nagel**, cf. the survey under tab 43, page 1.

The police estimate that today the Tvind Group controls assets (cash, properties, ships, etc.) amounting to a total of several thousand m DKK. In order just to give an idea of the magnitude of the assets controlled by the organisation, it may be mentioned that in 1995 the Tvind Group had a turn-over of more than one thousand m DKK (cf. minutes of meeting on 20 July 1995, tab 9 in the dossier). The value of property owned by Tvind in the US is estimated to about DKK 120 m, the value of property in Denmark in 1995 amounted to about DKK 265 m, while the value of plantations etc. owned by USS amounted to USD 38.9 m, cf. Exhibit 56-3-1-7 page 50 (the dossier, tab 9).

### 3.3. The Tvind Management

The Tvind organisation is often described as being externally a democratic, informal organisation, where the teacher group makes all decisions in harmony. However, it appears from documents found at the search on 25 April 2001, that the Tvind Group is organised in a strictly hierarchical structure with clear lines of command, cf. especially the dossier, tab 7.

The top level: **Mogens Amdi Pedersen** and **Kirsten Larsen** are the top management of the Tvind Group. It is impossible – except from a few cases – to separate these two persons, who usually sign jointly with the signature "KLAP". Also, Amdi Pedersen uses other designations for the group management such as "Our office" or "The Passing of the Year".

Second level: "LG's economy" is the management level just below Amdi Pedersen and Kirsten Larsen. In the period from 1992 to this date **Ruth Sejerøe-Olsen** and **Marlene Gunst** are responsible for this function, assisted by a number of staff members, such as **Anne** Hansen.

Third level: The individual main formation holders, i.e. the head of the schools in Denmark, the head of the Federation, the head of LG's commercial activities, etc. In the survey under tab 7 the heads as per 1992 are mentioned by name.

Fourth level: The operation managers, i.e. the line managers in the organisation, i.e. the individual head of each school, the head of collection centres, a shop manager, a manager of a plantation, etc.

Fifth level: The individual members of the teacher group.

It appears from a number of internal documents, letters, etc., of which a number are mentioned below, that KLAP (Amdi Pedersen and Kirsten Larsen) have the overall management of all activities in Tvind, assisted by "LG's Economy" – this applies to all three main areas for income in Tvind:

1.  School operation (Denmark, Scandinavia, England, Africa, USA),
2.  Collection and sale of clothes,
3.  Operation of plantations.

By way of conclusion, the seized documents prove that in reality **Mogens Amdi Pedersen** is the person in charge of the Tvind Group, and that in this capacity he is assisted by"LG's Economy", i.e. in the period 1987-1992 by Kim Bonde Andersen and **Sten Byrner**, and

after that **Ruth Sejerøe-Olsen** and **Marlene Gunst**. In addition, **Kirsten Fuglsbjerg** (aka Christie Pipps) is centrally placed as senior legal advisor to the Tvind management.

The persons mentioned , who must be considered to be the real leaders of Tvind, have the feature in common that they have not been formally elected to the management of any company or foundation, but exert their influence via the position of **Kirsten Larsen** and other trusted LG members in the central companies/trusts and – especially – via an underlying, informal power structure, which exists in parallel with the formal group structure.

In 1995 the core of the Tvind Group was two trusts on Jersey, The Hobbhouse Trust and the Farmers Trust, respectively. These trusts were organised as follows (cf. Exhibit 56-6-14, page 2, tab 43):



| Hobbhouse Trust | | |
|---|---|---|
| Protector | | Trustees |
| Kirsten Larsen, chairperson. | | LeGal Trustees |
| Anne Hansen | | (Jersey) Ltd. |
| Else Jensen | | LeGal International |
| Birgitte Krohn | | Galex Nominees |
| Svend Sørensen | | Ltd. |
| Joep Nagel | | |

| Farmers Trust | | |
|---|---|---|
| Protector | | Trustees |
| Kirsten Larsen, chairperson | | Fairbank Ltd. |
| Anne Hansen | | Cooper Invest, Ltd. |
| Else Jensen | | Lyle Enterprise Ltd. |
| Birgitte Krohn | | |
| Svend Sørensen | | |
| Joep Nagel | | |

| Fairbank Ltd. | Cooper Investment Ltd. | Lyle Enterprise Ltd. | Camberley Ltd. Radmore Ltd. Chatswood Ltd. |
|---|---|---|---|
| Kirsten Larsen | Anne Hansen | Joep Nagel | Lars Jensen |
| Else Jensen | Else Jensen | Svend Sørensen | Anne Nielsen |
| Birgitte Krohn | Birgitte Krohn | Anne Hansen | |

Tvind's operation companies, cf. the Group survey, tab 43

It appears from Sten Byrne's statement to Amdi Pedersen of 10 October 1992 (tab 3) that Tvind's operating companies are controlled by Hobbhouse/Farmers Trust, because all shareholders have signed deeds of conveyance concerning their shares to the benefit of the two trusts. During the period after 1995 the group structure has been changed, among other things, in that Fairbank Cooper & Lyle have been merged into one company.

### 3.4. The Humanitarian Foundation

In the opinion of the police, the Humanitarian Foundation is one of a number of institutions at the "Fourth level" in the Tvind organisation.

In the period between 1987 and 1993 the defendant **Bodil Ross Sørensen** functioned as chairperson of the Foundation. In the opinion of the police, **Poul Jørgensen** had during this period of time a decisive influence on the dispositions in the Foundation, and Poul Jørgensen became formally chairman of the Foundation in 1993. **Eva Vestergaard** has also had a

number of managerial posts in the Foundation, where she was deputy chairperson in the period 1993-1999. In addition, Eva Vestergaard has in some periods managed the administration of the Foundation in cooperation with LG's Economy's **Amdi Pedersen** and **Kirsten Larsen.** The management is exercised through the heads of LG's Economy.

In the opinion of the Police, the Foundation is managed (and has always been managed) direct by **Mogens Amdi Pedersen** and **Kirsten Larsen.** The management is executed through "LG's Economy" (i the period up to 1992 by **Sten Byrner**, among others, and from 1992 by **Ruth Sejerøe-Olsen** and **Marlene Gunst),** which has direct authority to instruct the chairman of the Foundation and thereby the board of directors of the Foundation. In the opinion of the police there are no more intermediate links in the chain of command between "KLAP" and the Foundation. The further documentation of this is found in a large number of documents, which have been obtained by searches:

- at Sten Byrner (documents of importance to the time from about 1993),
- at Plagborgvej 13 and Odinsvej in Grindsted (documents up to October/November 2000),
- at Vejlevej 80 in Tarm (actual, up to March, 2001).

The management of the Foundation cannot dispose of the property of the Foundation without obtaining the consent of KLAP and LG's Economy. It appears, for example, from the dossier under tab 17, that **Anne Hansen** from LG's Economy instructs **Eva Vestergaard** on for instance future applications to the Foundation. In the same document there is a list headed "The Foundation – fields of responsibility". It appears from the list that all transactions in the Foundation are to be sanctioned by "LG's Economy", which is also responsible (together with **Poul Jørgensen)** for all external relations. The survey of all the fields of responsibility in the Foundation has been written by Ruth (Sejerøe-Olsen) and Marlene (Gunst), cf. the Dossier. tab 22. Under tabs 25, 26, and 30, other examples have been enclosed to show that Mogens Amdi Pedersen through Ruth Sejerøe-Olsen and Marlene Gunst (and through Kirsten Fuglsbjerg) controls the administration of the Foundation, and a further number of pieces of evidence of this are mentioned below in sections 4 and 5.

### 3.5. Allocations from the Foundation

In the period 1987-1999 the Foundation has made allocations of totally about DKK 70 m to the following purposes, cf. the Foundation's own survey, Exhibit 71-1, page 29 (indications of amounts 71-2, page 192):

| Project name – period | Recipient | Sum paid | Exhibits in the case |
|---|---|---|---|
| 1. Global Research 1987-88 | IFAS | 2,300,000 | 56-3-15 |
| 2. International Distributors 1987-89 | IFAS | 350,000 | 56-3-12 |
| 3. Grand Garderobe 1987-89 | IFAS | 530,000 | 56-3-13 |
| 4. Mutual Mandarin 1987-89 | IFAS | 935,000 | 56-3-14 |
| 5. Tropical Farming Research 1987-89 | IFAS | 1,540,000 | 56-3-17 |
| 6. Scientific Farming in the Caribbean 1987-91 | IFAS | 1,175,000 | 56-3-16 |
| 7. Voice of the Third World 1988-92 | IFAS | 13,960,000 | 56-3-2 |
| 8. Biogas from Food Processing Waste 1989-90 | IFAS | 300,000 | |
| 9. Biogas plant in French Polynesia 1990-98 | La Societé Verte | 5,800,000 | 56-3-3 |
| 10. Tropical Forest, Malaysia 1990-94 | La Societé Verte | 4,200,000 | 56-3-1 |
| 11. Floryl 1992-2001 | LSV/L'Energie Etern. | 13,380,000 | 56-3-4 |
| 11. Power Station at Floryl | | 4,600,000 | 56-3-4 |
| 12. Estate – Wind Turbine 1993-94 | DSI Estate | 1,210,000 | 56-3-7 |

| | | | |
|---|---|---|---|
| 13. Environment Award of the Year | The Tvind School Association | 300,000 | |
| 14 The Research Project of 1 March 1995 | The Tvind School Association | 0 | 56-3-6 |
| 15. Solar Energy Project, Zimbabwe 1996 | DAPP Zimbabwe | 380,000 | 56-3-9 |
| 16. Solar Energy Project, Zambia 1996-2001 | DAPP Zambia | 1,250,000 | 56-3-11 |
| 17. Solar Energy, 200 Village Schools 1997 | The Federation | 1,500,000 | 56-3-10 |
| 18. AIDS Research and HOPE Projects 1996-2000 | The Federation | 4,000,000 | |
| 19. Foundation Payne's Creek 1996-2000 | FPC | 0 | 56-3-8 |
| 20. Solar Energy plant, educational workshops | | 0 | |
| 21 Relief GB and Angola 1999-2000. | The Federation | 2.230,000 | |
| 22. Relief to Kosovo 1999-2000 | The Necessary Seme. | 310,000 | |
| 23. HOPE Projects Southern Africa 1999- 2000 | The Federation | 7,400,000 | |
| 24. Supplementary grant, HOPE Centre | The Federation | 1.360,000 | |
| 25. Relief to Mozambique 2000 | The Federation | 200,000 | |
| 26. Hypothesis on Wind Power | DSI Estate | 1,600,000 | |
| 27. HIV/AIDS pilot project 2000 | The Federation | | |
| **Allocations, totally** | | **70,610,000** | |

In addition, the Foundation has made provisions for later allocations in a number of other cases. A number of these allocations have later been charged back.

| Project name – period | Grant | Actually paid | Exhibits of the case |
|---|---|---|---|
| 1. Global Research 1987-88 | 11,050,000 | 2,300,000 | 56-3-15 |
| 2. International Distributors 1987-89 | 350,000 | 350,000 | 56-3-12 |
| 3. Grand Garderobe 1987-89 | 530,000 | 530,000 | 56-3-13 |
| 4. Mutual Mandarin 1987-89 | 935,000 | 935,000 | 56-3-14 |
| 5. Tropical Farming Research 1987-89 | 1,540,000 | 1,540,000 | 56-3-17 |
| 6. Scientific Farming in the Caribbean 1987-91 | 1,175,000 | 1,175,000 | 56-3—16 |
| 7. Voice of the Third World 1988-92 | 13,960,000 | 13,960,000 | 56-3-2 |
| 8. Biogas from Food Processing Waste 1989-90 | 300,000 | 300,000 | |
| 9. Biogas Plant in French Polynesia | 5,950,000 | 5,800,000 | 56-3-3 |
| 10. Tropical Forest, Malaysia 1990-94 | 15,000,000 | 4,200,000 | 56-3-1 |
| 11. Floryl 1992-2001 | 16,274,000 | 13,380,000 | 56-3-4 |
| 11. Power Station at Floryl | 4,600,000 | 4,600,000 | 56-3-4 |
| 12. Estate Wind Turbine 1993-94 | 1,210,000 | 1,210,000 | 56-3-7 |
| 13. Environment Award of the Year | 300,000 | 300,000 | |
| 14. The Research Project of 1 March 1995 | 8,000,000 | 0 | 56-3-6 |
| 15. Solar Energy Project, Zimbabwe 1996 | 380,000 | 380,000 | 56-3-9 |
| 16. Solar Energy Project, Zambia 1996-2000 | 1,250,000 | 1,250,000 | 56-3-11 |
| 17. Solar Energy, 200 Village Schools 1997 | 1,500,000 | 1,500,000 | 56-3-10 |
| 18. AIDS Research and HOPE projects 1996-2000 | 4,000,000 | 4,000,000 | |
| 19. Foundation Payne's Creek 1996-2000 | 6,960,000 | 0 | 56-3-8 |
| 20. Solar Energy Plant, educational workshops | 2,000,000 | 0 | |
| 21. Relief GB and Angola 1999-2000 | 2,230,000 | 2,230,000 | |
| 22. Relief to Kosovo 1999-2000 | 310,000 | 310,000 | |
| 23. HOPE projects Southern Africa 1999-2000 | 7,400,000 | 7,400,000 | |
| 24. Supplementary grant, HOPE Centre | 1,360,000 | 1,360,000 | |
| 25. Relief to Mozambique 2000 | 1,600,000 | 1.600,000 | |
| 26. Hypothesis on wind power | | 200,000 | |

| 27. HIV/AIDS pilot project 2000 | | | |
|---|---|---|---|
| **Provisions, totally** | 110,164,00 0 | | |
| **Allocations, totally** | 70,610,000 | 70,610,000 | |
| Allocated, but not granted | 39,554,000 | | |

The investigation has shown that in projects investigated by the police, allocations to public interest purposes have in no case been made, but that the defendants have attempted to conceal this. In the following are mentioned only – for reasons of space – a number of allocations of a total of DKK 45 m within the three main purposes, which allegedly have received support:

Section 4: Allocations to "research purposes" – IFAS
Section 5: Allocations to "nature protection" – La Societé Verte and l'Energie Eternelle
Section 6: Allocations to "humanitarian" purposes – The Federation, UFF/Humana

The counts mentioned are still being investigated, and the description is thus a picture of the knowledge acquired by the police about the projects as per September-October 2001.

## 4: Payments to "promotion of research"

### Allocations to IFAS 1987-1992

#### 4.1. Survey of allocations to IFAS

As far as the following allocations are concerned, there are applications from IFAS (Institute for Scientific Research and Applied Sciences), and the purpose of the application is in all cases stated to be "research purposes":

Exhibit groups 56-3-12, 56-3-13, 56-3-14, 56-3-15, 56-3-16, and 56-3-17: Six research projects carried out by IFAS 1987-1990.

Exhibit group 56-3-2: Voice of the Third World, a research project carried out by IFAS 1988-1992, including Exhibit group 56-3-5: Maintenance of the ship "Return of Marco Polo".

In the period 1987-1992 payments have been made of totally about DKK 20 m to IFAS from the Foundation. In all cases IFAS has produced documentation to show that the money from the Foundation has in fact been spent on "promotion of research".

#### 4.2. Applicant: IFAS

The IFAS Foundation – Institute for Scientific Research and Applied Sciences – was founded in 1987 by **Lone Bjerre, Josefin Jønsson, Sten Højstrøm** and **Lars Fribert**, cf. exhibit 56-6-6 p. 6. Among other things, it appears from the statutes of the foundation (tab 35) that the purpose of IFAS is:

*"The private institution bases its research on the art of combining previous discoveries, inventions and known, but not co-ordinated mechanisms in a practice which all at once exploits all existing research results, and through action and precedent research in the field*

*as well as in the laboratory creates new perspectives and through research efforts also of a combinatory nature creates new products, materials, procedures and approaches to progress for various branches of trade. The private institution carries out basic research in a certain, special sense. The institution typically engages in studies concerning the identification of the real distance between the general level of the sciences and its advantages to the general population, especially in the Third World.. ".*

It also appears from the statutes that IFAS intends to cooperate both with commercial and non-profit partners.

The original board of directors of IFAS (14 September 1987 to 18 October 1993) consisted of **Birgitte Hector Nielsen** (chairperson) , **Anne Sophie Pedersen** (deputy chairperson), **Birgitte Krohn, Birgit Ring** and **Rikke Viholm.** Rikke Viholm is also founder of the Foundation. On 18 October, 1993 Birgitte Krohn was replaced by **Christian Jacobsen.** All members of the board were members of the teacher group in Tvind. Else Jensen, who is also a member of LG, was allegedly employed as "research manager" in IFAS.

IFAS was liquidated as per 31 December 1994. **Poul Jørgensen** was liquidator.

The investigation has shown that "IFAS" is a front organisation established and in reality managed by the defendant **Amdi Pedersen** that does not carry out any research projects, and which is established solely for the purpose of regularising payments to "research purposes". At no point in time has there been any activity in IFAS which may be characterised as research, and IFAS has had only pro forma employees. All income to IFAS stems from the Foundation, and all expenses are wages, travels and other expenses to the "research projects" mentioned below. All "employees" in IFAS have been members of the teacher group in Tvind or students at the Tvind schools (who do not receive any pay), and the working expenses go partly to the ship "Return of Marco Polo", which is owned by the Tvind Group via the ship owners B&B Shipping, Cayman Islands. The accounts for IFAS are part of Exhibit 56-6 of the case.

No persons on the board of IFAS nor any employees in IFAS or in the companies that have received money via IFAS are "researchers", nor have they any qualifications for carrying out research. This appears only implicitly from information given under threat of "day fines" by Poul Jørgensen to the Department of Private Law, Exhibit 71-1 p. 34 (the dossier, tab 36).

**Anne Sophie Pedersen** (deputy chairperson in IFAS) has also explained to the police that Amdi Pedersen decided everything related to IFAS's circumstances, and that she was in evidence only by name on the board, which signed only what it was asked to (Exhibit 54-x, the dossier tab 41). If at board meetings she has asked where the research projects presented to her should obtain their funding, the answer has always been: "From the Foundation!".

**Hans la Cour** has informed the police that Amdi Pedersen invented the whole idea of IFAS, including name, logo, objects clause, and its connection with the Foundation (Exhibits 54-5 p. 22, the dossier tab 39).

**Øyvind Wistrøm** has similarly explained that Amdi Pedersen, Kirsten Larsen and Sten Byrner formulated the statutes for IFAS and were behind the creation of this association/foundation, cf. Exhibit 54-4, p. 10, the dossier tab 38. It appears from the same statement that the decision of dissolving IFAS in 1993 was not made by the board of IFAS, but at a meeting in Tvind's management in Grindsted.

It is noted that the defendants have attempted to keep back information about IFAS from the authorities. It also appears from the decision of the Department of Private Law of 26 June, 2001 (Exhibit 71-1 p. 3 ff, tab 36) that among other things the Department has requested that the Foundation should hand over a number of documents about IFAS, among others the application from the project "Voice of the Third World", cf. below. On 6 November, 1997, **Poul Jørgensen** stated that documents concerning this project had been burned (Exhibit 71-1 p. 6), and 28 July 1998 that the Foundation could not explain IFAS's circumstances (Exhibit 71-1 p. 7). On 15 November 1998, Poul Jørgensen stated that "*he has no immediate access to IFAS's voucher material for the years 1988-1992*".

At the search on 25 April 2001 the police found the documents which allegedly had been burned and the exhibit material concerning IFAS in a safe at Poul Jørgensen (cf. Exhibit 71-1 p. 12). Subsequently Poul Jørgensen has also declared to the Department of Private Law that he knew the persons well who stood behind among others IFAS and the projects, and that this is also the background of the Foundation's grant of an amount to IFAS on the same day or the day following receipt of the application for support.

**4.3. The actual application of funds paid to IFAS:**

**4.3.1. Initial "research projects", Global Research, etc.**

**4.3.1.1. Applications and grants:**
**4.3.1.2 The police investigations of the projects:**

This section is being prepared. The IFAS projects in this period include the following:

**B.1.1 (exhibit group 56-3-15):** Global Research

**B.1.2 (exhibit group 56-3-12:** International Distributors

**B.1.3 (exhibit group 56-3-13):** Grand Garderobe

**B.1.4 (exhibit group 56-3-14):** Mutual Mandarin:

**B.1.5 (exhibit group 56-3-17)** Tropical Farming Research

**B.1.6 (exhibit group 56-3-16)** Scientific Farming in the Caribbean

**4.3.2 Voice of the Third World (Count B.1.7, exhibit group 56-3-2**

**4.3.2.1. Application and Grant:**

On 25 August 1988 "All Europe Satellite Television Ltd." London, applied IFAS for support for a research project, which aimed to show that "satellite TV may be a culture carrying tool that brings people in north and south closer together". The application (Exhibit 56-3-2-2, p. 1) had allegedly been prepared by **Øivind Wistrøm,** who indicated an address in Luxembourg. The title of the project was "Voice of the Third World", and it states, among other things, that "*the project has at the same time a commercial aim and a public utility aim, wherfe the utility aim is the fundamental aspect*".

The application asked for DKK 9,060,000, which is to be spent on two purposes: (1) establishing a TV station, including wages, and (2) establishing "the sailing studio Return of Marco Polo", including wages.

On 31 August 1988 IFAS then applied the Foundation for a grant of DKK 12,828,000, IFAS having allegedly decided to enter into collaboration with All Europe Satellite Television Ltd. on the project. The application (Exhibit 56-3-2-2 p. 10) indicates that the funds are to be applied on "*a research project in connection with establishing and implementing a research project in connection with a new television station*". The application is signed by **Anne Sophie Pedersen**, deputy chairperson in IFAS.

On 31 August 1988 **Thomas Vaeth**, who allegedly was board consultant for IFAS, explained about a visit to the applicant. Thomas Vaeth had gone through the project with **Henrik Sørensen**, who "functions as leader of the present TV studio", cf. Exhibit 56-3-2-2 p. 12.

On 1 September 1988 the Foundation decided to grant the application to IFAS, cf. Exhibit 13-1 p. 22. The board "*expressed satisfaction with the vitality, power, and scope of the project*".

The decision was made by **Bodil Ross Sørensen**, Anne Hansen, Helle Aaboe, Hanne Vesterborg, and Else Kragholm Nielsen.

In the period to follow, All Europe Satellite Television Ltd. established a TV channel called "One World Channel". This TV channel was given transmission time by satellite via an agreement with a French TV station, and from there in the period between 1989 and 1991 a number of TV programmes was transmitted approx. 1-2 hours every morning. An example of the programme parade from One World Channel is included in Exhibit 56-3-2-6 p. 10 f. An important feature in the programmes offered was about 150 TV programmes titled "Return of Marco Polo". Otherwise the range of programmes consisted of programmes on UFF/Humana and on conditions in the Third World, including programmes produced by TV stations in Africa, China, and other places.

The TV programmes "Return of Marco Polo" were produced by a TV team onboard the ship of that name. The ship sailed from South America into the Pacific and produced TV programmes about the life and the people in the countries and on the islands where the ship called. The production manager on board was **Hans la Cour Andersen.** The captain was **Henrik Wibrand.**

According to information from the Foundation itself, the grant to IFAS has been paid with DKK 13,963,000, which has been spent on lease of the ship (DKK 2,600,000), operation of the ship and equipment (DKK 5,277,000), equipment and materials (DKK 848,000), administration and communication (DKK 1,040,000), and wages (DKK 4,197,000), cf. Exhibit 71-1 p. 194.

### 4.3.2.2. The police investigation of the project:

The investigation has shown that no form of "research" was carried out in connection with establishment and operation of "One World Channel", and that likewise in connection with the operation of the ship "Return of Marco Polo" or the productions of the TV programmes of the same name there was no form of research carried out. *On the contrary, the funds for the project were spent on production and transmission of opinion forming TV programmes.* This is not "research", and the support has been given directly or indirectly to All Europe

Satellite Television Ltd./One World Channel AS, which operated a commercial, partly advertisement financed TV station. Therefore it is not a case of support for a *public utility* purpose.

**The ownership relations to the parties involved:**
All Europe Satellite Television Ltd. (AEST) is a company registered in England. The company was owned by Jonas Israel and Hans Jørgen Laustsen. AEST is found in the Group diagramme under tab 43 as an LG company, which is to be closed as per September 1995 (p. 31).

**One World Channel AS** was a Norwegian limited liability company. In this company Øyvind Wistrøm was manager (Exhibit group 56-3-2-12).

The ship "Return of Marco Polo" was owned by **B&B Shipping Ltd.**, a company registered on the Cayman Islands. Sten Byrner and Henning Bjørnlund were behind this company. B&B Shipping is shown in the Group diagram as an LG company, which is to be closed in 1995, so that the ownership of the ship Return of Marco Polo is to be transferred to **Argyll Smith & Co. Ltd.** A Tvind company on Jersey, owned by Fairbank, Cooper and Lyle), cf. the Group diagram, tab 43 p. 17.

In the same way as in the previous projects, IFAS has employed the company of **John F. Parson Inc.** as consultants. This company is registered in the US and was controlled by Sten Byrner and Henning Bjørnlund. As indicated above, John F. Parson Inc. was owned 100% by the Caribbean Farming Ltd. (a Tvind company on the Cayman Islands), which in turn was owned 100% by Fairbank, Cooper and Lyle Ltd.

**Tvind's TV station**
**Øyvind Wistrøm** has explained to the police, among other things, that he was a member of LG from about 1978-1992. The decision to establish Tvind's own TV station was made by LG in 1986-87 (Exhibit 54-4 p. 10). **Kirsten Larsen** gave him the task to establish this TV station, and as initial capital he was paid up to DKK 500,000 in cash. Otherwise Wistrøm settled the accounts with Birgitte Lerbech Larsen (who in periods acted as cashier of the Foundation). The station was intended to transmit TV programmes dealing with Tvind and the conditions of the Third World. It was intended to operate a commercial TV station (p. 16). Together with **Poul Jørgensen, Kirsten Larsen** and **Sten Byrner** it was decided to establish a company in England, via a purchase and a change of name of an existing company (AEST Ltd.). In addition a Norwegian limited liability company with the name One World Channel AS was established, because Wistrøm did not want to have permanent residence in England. The turnover was placed in AEST Ltd., whose accounts were worked out by the Tvind administration in Grindsted. Sten Byrner had the contact with the English solicitors, who were cooperating in the purchase and administration of the company. Wistrøm has not prepared budgets, research hypothesis or the application itself to IFAS, although the application bears his signature. Nor has the witness prepared reports to IFAS about the project. Wistrøm does not know Else Jensen, the research manager in IFAS, as a researcher, but as a member of LG (p. 16).

In connection with Wistrøms statement it should be noted that in the opinion of the police, the English company of AEST is a brass plate company without any proper operation, and inserted in order to camouflage the cash flow between the Foundation and the TV station.

**The activities on the ship Return of Marco Polo:**
Regarding the production of TV programmes on board the ship it has been established that all crew members were members of the teacher group in Tvind, cf. for example Exhibit 56-

3-2-7 p. 23 (letter from Hans la Cour to Else Jensen, who was the alleged "research manager" in IFAS). None of the crew members had any qualifications for making "research" or for producing TV, cf. Exhibits 56-3-2-7, p. 23-29, and cf. **Hans la Cour's** statement to the police, Exhibit 54-5, p. 52 (tab 39).

The Civil Law Directorate has attempted to throw light on this situation in connection with the Directorate's supervision of the Foundation, cf. Exhibit 56-3-2-9, p. 15. On 14 November 1998, for example, the Directorate requested the Ministry of Culture to evaluate the "research related nature" of the project. It appears from the reply from the Ministry of Culture (Exhibit 56-3-2-9, p. 19) that in order to make this evaluation, the following is missing, among other things:

- a normal scientific project description,
- lists of collaborators with scientific qualifications and their CVs,
- documentation of how the research results have been published in acknowledged publications.

The Foundation (represented by **Poul Jørgensen**) refused to supply this information, cf. 56-2-

9, p. 21, the dossier tab 36.

**Hans la Cour** has further explained, among other things, that the project, including the roles of IFAS and the Foundation, was decided upon by **Amdi Pedersen** (Exhibit 54-5, p. 55). The purpose of the TV station was to promote Tvind and LG. At a meeting in Grindsted on 9 November 1988 the first transmissions from the ship were shown to the inner circle of Tvind, namely **Amdi Pedersen, Kirsten Larsen, Else Jensen, Thomas Vaeth, Ruth Sejerøe-Olsen,** and **Bodil Ross Sørensen** (p. 53). At this meeting Amdi Pedersen and Bodil Ross also discussed the purpose of the TV station. The purpose of the voyages with the ship was also that of searching for plantations that could be bought by Tvind (p. 54). No media research was carried out on board the ship, and the research related activities were limited to Else Jensen's instruction to the crew to prepare reports to demonstrate that "action research" was carried out (p. 55).

It also appears from Exhibit 56-3-2-7, p. 55, that the purpose of the ship was <u>to</u> let LG members participate in expeditions in the Pacific, <u>to</u> produce TV programmes meant to be sold to Tvind's own TV station and to commercial stations, and <u>to</u> use the ship for tourist cruises. Hans la Cour expected that in 1991 the ship's economy could be self-supporting, i.e. that "*IFAS will fade from the picture*". It appears from Exhibit 56-3-2-7, p. 61, that Hans la Cour has reported about the ship's economy to **Sten Byrner.**

### The actual application of the funds for the project

The preliminary investigation of the actual application of the funds that have been granted to the project shows, among other things, that the sum of DKK 4.3 m paid as wages has not been paid effectively to the "researchers" who were "employed" in the IFAS framework. Øyvind Wistrøm has not received wages, either.

A major item – approx. DKK 2.6 m – is the leasing of the ship. This amount has been paid to the Caymen Islands company of **B&B Shipping** (Byrner and Bjørklund), which according to a lease contract with IFAS charged a monthly lease of DK 50,000 for IFAS's use of the ship "Return of Marco Polo" (formerly "Store Claus"), cf. the equivalent arrangement in count B.1.1).

Finally there are payments of about DKK 800,000 to **John F. Parsons Inc.** concerning wages and consultant fees. These payments are based on a contract between the company (Sten Byrner and "Henry Henning" – alias Henning Bjørklund) and IFAS. The services

performed by the company to justify the remuneration have not been established. About John F. Parsons Inc. it is noted that the ownership relations to the company have been described above, and that this company appears in other relationships as buyer of Tvind's properties in the US, among others a property on Key West, Florida.

**Conclusion**

On this background the Prosecutor finds that there is probable cause to suspect that there was no form of research carried out in the project "Voice of the Third World", and that it is consequently unlawful that allocations have been made and that deductions have been made for these allocations and for provisions to the project.

## 5. Allocations to "support of the natural environment"

### Allocations to La Societé Verte, Paris/L'Energie Eternelle, Paris 1992-1998

#### 5.1. Survey of allocations to LSV/LEE

In the following cases there are applications from a French association, La Societé Verte (later L'Energie Eternelle).

Exhibit group 56-3-1: **Count B.1.10:** Grant of DKK 15 m (DKK 4,197,554 paid out) to nature protection in Malaysia, project period 1990-1994.

Exhibit group 56-3-3: **Count B.1.9:** Grant of DKK 348,548 and DKK 5,948,795 (all paid out) to nature protection on Tahiti, project period 1989-1998.

Exhibit group 56-3-4: **Count B.1.11:** Grant of DKK 17,212,735 (DKK 14,337,270 paid out) and DKK 3,644,655 (all paid out) to nature protection in Brazil, project period 1994-2001.

In the group of allocations to "support of the natural environment" there is also Exhibit group 56-3-7: **Count B.1.12:** Grant of DKK 1.2 m (all paid out) to Tvindkraft, and Exhibit group 56-3-8: **Count B.1.19:** Purchase of the nature reserve Payne's Creek, Belize (DKK 6.9 m, the funds have been paid back). These grants have not been made via LSV/LEE and for reasons of space they are not further mentioned in the following.

#### 5.2. The applicant: La Societé Verte (LSV) and L'Energie Eternelle (LEE):

The association La Societé Verte was founded by **Sten Byrner**, who was chairman of the association until mid-1992. The association was registered with the authorities in France on 19 November, 1991 (Exhibit 10-2). In 1992 the executive committee consisted of **Lars Jensen, Bodil Sejerøe-Olsen** and **Anne Hansen.** The object of the association (Exhibit 10-2 p. 2) is, among other things, "*to assist in the protection and respect of the environment.*" The association appears as an independent, idealistic association, which has received grants from the Foundation to three "nature protection projects".

In 1993 Tvind founded one more French association, L'Energie Eternelle, which then took over the activities. The chairman of the management in LEE was **Lars Jensen.**

The investigation has shown that La Societé Verte and L'Energie Eternelle are front organisations, founded by the defendants, without any independent management, no office premises (except for a PO box address), no employees, no independent activities, and no real tasks.

These associations have been inserted as intermediate links (outside the control of the Danish tax authorities) in order to justify that in the below mentioned cases funds have been paid to the "protection of the natural environment". In reality the French associations are controlled by the defendants, and both associations appear in the group diagram as LG companies (tag 43, p 29). The members of the executive committee in the period 1990-1998 are all prominent members of LG.

It also appears from several documents found at the search that both **Lars Jensen** (the chairman of LSV after Sten Byrner and chairman of LEE)) and the defendant **Poul**

**Jørgensen** in cases related to the association receive instructions from the other defendants and from other persons outside the association. An example is found in evidence exhibit G-2-2, the dossier tab 5, where Anne Hansen asks Sten Byrner to prepare an additional application for the Biogas Project (B.1.9), because too much money had been spent in Denmark on this project. Thus, LSV did not keep the books for this project, for example. Amdi Pedersen and Kirsten Larsen decided the procedure for dissolving the French associations in 1998 and in a number of cases disposed of the funds paid into the associations from the Foundation, cf. the dossier, tab 34.

In order to camouflage the connection between the Tvind management and LSV/LEE, **Poul Jørgensen** has given the Department of Private Law incorrect information, cf. for example Exhibit 56-3-1-8 p. 8, where it is stated that Poul Jørgensen does not know the composition of the LSV executive committee. In this connection Poul Jørgensen has not mentioned that it was actually himself who in a number of cases made decisions in LSV/LEE (for example the dossier tab 10).

**5.3. The actual application of the funds granted to LSV/LEE:**

**5.3.1. Count B.1.10 (Malaysia):**

**5.3.1.1. Application and grant:**

On <u>7 December 1990</u> **South China Sea Farming Snd. Bhd.** applied LSV for a donation of USD 2.5 for a "*new environment and research project Tropical Forest in Malaysia*". The application was signed by **Kim Bonde Andersen** (Exhibit 56-3-1-2 p. 0e).

On <u>16 December 1990</u> La Societé Verte (represented by the chairman **Sten Byrner**) – with the same description of the project – applied to the Foundation for DKK 15 m for this purpose, stating that "*the project is to be implemented in close cooperation with the authorities in Sabah*"(Exhibit 56-3-1-2). It appears from the application from LSV, which is worded in English, that allegedly it concerns "*a nature protection project aiming to show that the protection of the resources of the rain forest may well be combined with organised, profit-making exploitation*" (application in Exhibit 56-3-1-3 pages 1-9, cf. also Exhibit 21-2 page 60). Allegedly there are also elements of research in this project, because the application mentions also "four theses on forestry" which are to be tested.

In a letter of <u>20 December 1990</u> to the board of directors of the Foundation, the chairperson **Bodil Ross Sørensen** proposed that the Foundation should provide DKK 15 m for the project. The defendant Ross Sørensen stated in the letter that "*the project is for the protection of the natural environment and in that connection a research project also falling within the object of the Foundation*". The defendant also stated that an agreement was to be made with LSV on the implementation of the project. Finally it appears that the grant can be paid out only when "*standard project material can be worked out*".

Bodil Ross Sørensen then worked out this project material and put it before the board. Five persons have affixed their signatures to the letter (cf. Exhibit 56-3-1-1). By letter of <u>28 December 1990</u> the Foundation (Ross Sørensen) informed LSV that DKK 15 m had been granted to the project.

A total of DKK 15 m was granted to the project. As on 31 December 1991 DKK 3 m had been paid out. As on 31 December 1992 further DKK 5 m was paid out. This amount was not fully spent, because the local authorities refused to give the owners of the plantation a logging licence, after which the sawmill at the plantation had to close down.

The owner of the plantation in Malaysia was a company registered in Malaysia, **Nasib Daya (Sabah) Sdn.** This company was owned in turn by **Sediamas Sdn. Bhd.**, which in turn was owned by South China Sea Farming Sdn. In the material presented to the Danish authorities there is no indication that any of the defendants, LSV or the Foundation have any connection with these companies.

### 5.3.1.2. The police investigation of the project

The investigation has shown that South Sea Farming Sdn. Bhd. is a *commercial enterprise, controlled by the defendants, and where the profits accrue to the LG treasury.* Therefore the payments are unlawful (not for a *"public utility"* purpose).

**Operation of plantations in USS**

It appears from the dossier, tab 7, that the plantation in Malaysia is one of several "sources of income to the LG treasury". The forest project is equal to other "USS companies" in budgets and accounts for 1990-1992, found at search at Sten Byrner.

The **USS** (University of the Seven Seas) is an organisation in Tvind, whose object, *"after purchasing plantations and farms, is conduct of commercial activities through a positive development of both the land area and the local population".* The USS enterprises are managed like other enterprises, where cost targets and plans for increasing the operating profit are set up, cf. also the dossier tab 24.

In the survey of LG activities (56-3-1-7, p. 43 ff, tab 42) are mentioned 61 different projects under USS, including No. 234-237, which are sawmills and sale of wood from Nasib Daya. It also appears from documents under Evidence Exhibit G-2-3 that forest project and sawmill in Malaysia are part of the USS enterprises, which in turn make contributions to LG's treasury.

It appears from documents in Evidence Exhibit G-2-4 that the defendant Amdi Pedersen exercises powers of instruction over "USS i Malaysia", and that it is crucial that the plans in Malaysia are kept due to among other things *"the time for the arrival of the income.."*. It appears from the Dossier, tab 4, that in the autumn of 1992, KLAP is to make an inspection tour to Malaysia, and that on 20 October, 1992, **Sten Byrner** and **Kim Bonde Andersen** explain the income from the plantation in Malaysia, where the profit amounts to USD 20 per m3, but where this profit may be increased.

**The ownership of the companies involved**

It appears from the Group Diagram tab 43, p. 3, that Tvind's companies in Malaysia are organised as follows:



Thus the owner companies of the plantation in Malaysia were controlled by the defendant Amdi Pedersen via Fairbank, Cooper and Lyle. In addition, LG's Economy, **Kim Bonde Andersen and Sten Byrner**, could dispose of the operation in Nasib Daya with direct reference to Amdi Pedersen and Kirsten Larsen. This appears for example from the dossier, tab 4 and tab 6.

**Backdating of documents**

Documents about payments to the Malaysia project appear to be backdated. For example, the application to the Foundation is dated 20 December 1990. It appears from Exhibit 56-3-1-1 p. 2d that on 5 August 1991 Birgitte Lerbech Larsen sent the application to chartered accountant Erik Rømer Jensen as documentation that DKK 17 m had been granted to the two projects in 1990. On 6 August 1991 chartered accountant Erik Rømer Jensen advised Birgitte Lerbech Larsen that it was only certain that the allocation was deductible if the recipient had been informed about the decision. A contract therefore had to be drawn up with IFAS. It has been added in handwriting: "before 31/12-90" – Exhibit 56-3-1-1 p. 2a. The first payment to the project was made on 31 December 1991, that is more than a year after the decision was allegedly made.

**The actual application of the funds of the Foundation**

The authorities in Malaysia have had no control with whether the funds from the Foundation were spent on nature preservation or on research. It appears from Exhibit 56-3-1-8 p. 4 that the Danish Embassy in Kuala Lumpur has investigated this issue, and that neither the Federal Forestry Department nor the local authorities in Sabah have any knowledge of the project (Evidence Exhibit G-1-1).

Of the funds actually paid, the main part has been applied on the purchase of the company Nasib Daya, cf. the statement in Exhibit 56-5-1-5 p. 9. Thus the funds have actually not been spent on nature preservation. Moreover it is the Prosecutor's impression that other large amounts in this project have been spent on quite irrelevant purposes.

Of the original grant of DKK 15 m a payment of DKK 7.9 m was made. However, only a small amount was spent, cf. Exhibit 56-3-1-3 p. 11-12. It appears from this letter from LSV to the Foundation that the "excess" amount, USD 577,861, can be paid back in a number of instalments over three years. This shows that the money has been spent on other purposes. Chartered accountant Erik Rømer Jensen established this at the auditing of the accounts of the Foundation as per 1993, noting that to him it was *"incomprehensible that the money was not simply paid back"*, cf. Exhibit 56-3-1-5 p. 55. However, this has not caused the chartered accountant to make a report in the accounts of the Foundation.

Part of the grant applied to Malaysia – FF 367,800 – consists of consultancy fees etc. for **Jambalaya Ltd.**, cf. Exhibit 56-3-1-5 p. 5. It does not appear from LSV's accounts what role the company plays or what the money has been spent on. However, Jambalaya Ltd. appears in the Group Diagram of the Tvind Group, tab 43 p. 28. It is a company registered in Hong Kong, whose activities are stated to be "project management" for LSV and LEE. The company is owned by by **Jayhawk Ltd.** and **Buckeye Ltd.** It appears from the group survey, p. 9, that these companies are in turn owned by Fairbank, Cooper and Lyle, i.e. by Farmers Trust.

It seems that other large amounts for the project, approx. USD 440,000, have been spent on purchasing flats in Miami, while about USD 25,000 was transferred to Kirsten Larsen personally.

On <u>24 January 1992</u> a sum of USD 846,000 was transferred from the USD account in Bikuben, Copenhagen, belonging to the Foundation. The payments are booked in the Foundation on account 4009, which is headed: *"LSV – Tropical Forrest"*. Of the amount, USD 346,000 was placed to LSV's account in Barclays Bank, Paris.

On <u>27 January 1992</u> the balance of USD 500,000 was placed to an account in Barclays Bank, Miami, belonging to **Sten Byrner** (in his capacity of chairman of LSV). On a document of 23 January 1992 **Bodil Ross Sørensen** has stated the purpose of the payment to be "support to a project". The balance of Sten Byrner's account was raised by the transfer to approx. USD 510,000, and the following day – <u>28 January 1992</u> – Byrner transferred USD 440.010 to the estate agents Kline, Moore & Klein, Miami. The amount roughly matches the down payment on flats in The Sterling, Miami, which were bought by **Chilton Intervest Corp.**, cf. tab 43. For one of these purchases **Svend Sørensen** (at the same time manager in South China Sea Farming) signed surety for a loan for the purchase. The flats in Miami have since been inhabited by members of the Tvind management. It appears from the Group diagram p. 17 that Chilton Intervest Corp. is a company owned by Fairbank, Cooper and Lyle.



Additionally, an amount of USD 25,020 was on <u>6 February 1992</u> transferred from Byrner's account in Barclays Bank to **Kirsten Larsen's** American Express account in Sun Bank, Miami.

**Conclusion**

On this background there is probable cause to suspect that funds for the Malaysia project have been paid to purposes which cannot legally receive money from the Foundation, and that deductions have also been unlawfully made in the tax returns of the Foundation for payments and provisions for the project.

### 5.3.2. Count B.1.9: Biogas plant French Polynesia

#### 5.3.2.1. Application and grants

By an application of <u>1 October 1990</u> the LSV applied the Foundation for financial support to an amount of DKK 2,500,000 for establishing a biogas plant in French Polynesia. The application is worded in English in Paris and signed by **Sten Byrner**.

It appears from the application among other things that a local farmer has applied for financial and technical support from LSV for solving a pollution problem. It also appears that Mr. Stein operates a large farm in Tahiti, with a livestock of approx. 1000 pigs and about 20,000 pcs. poultry. According to the information the local authorities have ordered Mr. Stein to do something about the resulting pollution. It also appears from the application that LSV has not applied to other foundations because LSV is of the opinion that only Tvind's Humanitarian Foundation will treat LSV seriously.

According to the application LSV has "*decided*" to carry the costs of building a biogas plant on Mr. Stein's premises and to employ Mr. Stein during the construction period. The purpose is to protect the environment from the pollution from the large number of animals and to convert the manure into energy, thereby being a model for the other farmers.

It appears from the minutes of a board meeting in the Foundation on the same day, <u>1 October 1990</u>, that the board – after thorough discussion and having especially made a point of the primary benefit to the natural environment – decided to grant DKK 2,547,000 to the project, cf. Exhibit 56-3-3-1.

According to an undated application, LSV represented by Sten Byrner applied for further funds, so that the total grant amounts to DKK 4,518,000, cf. Exhibit 56-3-3-2. By letter dated <u>20 March 1991</u> the Foundation represented by the chairperson **Bodil Ross Sørensen** replied that the application could be granted. The board meeting was held on 20 March 1991.

By agreement of <u>9 December 1992</u> LSV represented by Lars Jensen borrowed DKK 309,000 from Fælleseje represented by **Poul Jørgensen** for the use of the project. The amount was to be repaid at the latest on 1 February 1993, cf. Exhibit 56-3-3-2.

By letter of <u>21 December 1992</u> LSV applied for a further amount of DKK 309,000 from the Foundation. It appears from the minutes of <u>31 December 1992</u> that the Foundation has received an application – in the first instance verbally – from LSV represented by **Lars Jensen** to a further amount of DKK 309,000 for the "project", among other things as a consequence of extra expenses for consulting, travels, etc. According to the minutes the grant has been decided by the board of the Foundation on the basis of some memorandum.

By letter of <u>31 December</u> 1992 the Foundation represented by the chairperson Bodil Ross Sørensen announced that the application for DKK 309,000 had been granted. On <u>7 January 1993</u> LSV asked the Foundation to pay the granted amount of DKK 309,000 to Fælleseje. On <u>26 January 1993</u> **Poul Jørgensen** confirmed on behalf of the Foundation that the amount had been paid to Fælleseje.

By letter of <u>25 January 1993</u> LSV represented by Lars Jensen applied to the Foundation for further support, so that the total support amounted to DKK 5,778,795. By letter of <u>21 February 1993</u> the Foundation represented by the chairman **Poul Jørgensen** stated that the application for DKK 945,000 had been granted. It appears from the minutes of the board meeting that the decision was made on <u>20 February 1993</u>. By letter of <u>25 February 1993</u> LSV, represented by Lars Jensen, requested the Foundation to pay the amount to LSV's account 2102586551 in Citibank Miami and account 72890500101 in Barclays Bank in Paris.

By letter of <u>13 May 1994</u> LSV represented by Lars Jensen asked the Foundation for a further payment of DKK 170,000 for the project. By letter of <u>22 May 1994</u> the Foundation represented by the chairman Poul Jørgensen replied that the application had been granted.

**5.3.2.2. The police investigation of the project**

The investigation has shown that the final recipient of the funds from the Foundation, Mr. Stein, is a personal friend of the defendant **Amdi Pedersen** and others. By the decisions in the Foundation described, support has been given to *an individual, who carries on commercial activity*. Therefore the payments are unlawful (not "public utility").

**Protection of nature**
**Hans la Cour** has explained to the police (Exhibit 54-5 p. 35) that he had no first-hand knowledge of the project, but that in 1993 he had visited Stein on Tahiti, where he met Lars Jensen, who was Tvind's "Mr. Fix It". He has later spoken to Stein's son, who had said that the plant never became operational. It appears from Hans la Cour's written statement to the police that **Amdi Pedersen** and **Kirsten Larsen** originated the idea of the project and convinced Stein that the biogas plant was the solution to the problems he had with pollution. It appears from an e-mail from Hans la Cour to **Stig Jørgensen** (Exhibit 54-2-14) that originally Amdi Pedersen met Stein at a round-the-world trip, and that Amdi Pedersen and his fellow travellers stayed for six months at his estate. Amdi later returned and visited Stein, who has also visited Denmark.

**Walther Juul Hansen** has similarly stated to the police that together with Amdi Pedersen and seven others he participated in a round-the-world trip in 68/69. In August 1968 the group arrived in Tahiti. Here they met Stein and his family. Stein made a site available to the group where they built a hut, and Stein supplied them with food. They stayed there for about a month until they were asked by the French authorities to leave Tahiti (Exhibit 54-9 p.4).

It appears from the reports prepared by LSV (Lars Jensen) that establishing the biogas plant will prevent Mr. Stein's closing his enterprise and provide an opportunity for him to expand the operation of the farm, cf. Exhibit 56-3-3-4 p. 16 ff.

**The actual application of the funds**
A biogas plant has been constructed at Mr. Stein's estate. However, there is no documentation that all the funds granted to the project have actually been spent on the purpose. The accounting material for the project is deficient, and – judging by the dates – all the accounts have been made subsequently, in 1995 (Exhibit 56-3-3-6, see tab 10, letter

dated 12 June 1995 to Poul Jørgensen with attached draft for 1991 accounts for LSV). In several cases the accounts seem to be incorrect. For example, the Tvind management (Kirsten Fuglsbjerg) instructs Lars Jensen and Poul Jørgensen how reports from LSV etc. are to "explain" the application of the money for the project, cf. tab 21.

As in a number of the previous projects an agreement has also been made in this one on "consulting assistance" etc. with the company **John F. Parsons Inc.**, cf. in more detail above in section 4.3.2.2. A sum of FF 620,000 has thus been paid to this company without any further explanation of how the company has contributed to the project, cf. Exhibit 56-3-3-6 p. 5.

Via the project, substantial loans from the funds of the Foundation have been made to the Jersey company **Kirchheiner Bros. Ltd.** In 1991 a sum of FF 676,000 has thus been transferred from the Tahiti project as a loan to Kirchheiner Bros. Ltd. (cf. Exhibit 56-3-3-6 p. 15). In 1992 a loan of FF 1.244 m has been granted to the same company. It seems that both loans have been settled in 1995, cf. Exhibit 56-3-3-6 p. 45A.

It appears from Sten Byrner's papers (tab 2, picked from Evidence Exhibit G-2-3) that **Kirchheiner Bros. Ltd.** is centrally placed in the Tvind group, and that the company is controlled direct by KLAP. In the Group diagram on page 18, Kirchheiner Bros. Ltd. appears as one of four Tvind companies under the heading: "LG Bank Accounts". In the same place it appears that the company is managed by Kirsten Larsen, Else Jensen, Birgitte Krohn, and Anne Hansen, and that the company is owned by Fairbank, Cooper and Lyle.

### Administration of the project
There is no evidence that LSV has managed the project. As for applications, etc. it is noted that these have allegedly been prepared in English in Paris, among other places, but that they contain the Danish letters æ, ø, and å. The indications of time in the initial application also point in the direction that all applications have been prepared by Tvind in Grindsted under direct instructions from LG's Economy.

Thus it appears from a number of documents from 1998 (tab 34) that in 1998 **Marlene Gunst** and **Ruth Sejerøe-Olsen** as agreed with Amdi Pedersen and Kirsten Larsen instructed Poul Jørgensen and Lars Jensen to ensure that LSV was closed down and that the ownership of the biogas plant was transferred to Stein against payment of 10 $. There are detailed instructions to Poul Jørgensen and Lars Jensen to prepare a fictitious correspondence about this topic. It appears that the topic has been put before Amdi Pedersen/Kirsten Larsen.

On 19 November 1998, after the decision had been made, Lars Jensen wrote on behalf of LSV to the Foundation that LSV wished to liquidate and in this connection to transfer the ownership of the biogas plant to Stein. In this connection the Foundation's consent to this is requested. By letter dated 6 December 1998, the Foundation represented by the chairman/Poul Jørgensen that the board has held a meeting and can accept that the ownership is transferred to Stein. All according to the instructions given by Marlene Gunst/Ruth Sejerøe-Olsen and KLAP.

There are minutes available of a board meeting (telephone meeting) allegedly held on 6 December 1998, at 4.00 p.m. – subsequently signed by Poul Jørgensen, according to which the board decides that the ownership may be transferred to Stein, cf. Exhibit 13-1-2 p. 63. Therefore the decision has not been made by the Foundation board but by the defendants Amdi Pedersen and Kirsten Larsen on 26 October 1998.

**Conclusion**

On this background there is probable cause to suspect that the funds for the Tahiti project have been paid unlawfully, and that the deductions for allocations and provisions for the project have been made unlawfully.

### 5.3.3. Count 1.11: Floryl, Brazil

**5.3.3.1. Application and grant**

On 11 December 1992 LSV applied for support to an amount of USD 2,575,000 to a *"unique nature protection project"* in Brazil. In the application, which is signed by **Lars Jensen**, it is mentioned that a very large plantation in Brazil (totally 104,000 ha) has been owned by Shell, but that LSV has now entered into an agreement on cooperation with *"the new owner"* (Exhibit 56-3-4-2 p. 17). It does not appear from this or the following documents who "the new owner" is.

It appears from later correspondence that **Floresta Atlantica Ltda** owns the plantation. For this company **Tove Birkøe** signs as "manager". Tove Birkøe was one of the two founders of the Foundation. From accounts, etc. it appears that the funds paid by the Foundation to LSV/LEE, which these associations pay to the owner, are spent by a number of subsidiaries (Exhibit 56-3-4-8 p. 21)

At a meeting on 14 December 1992, the Foundation decided to grant the amount applied for (**chairperson Bodil Ross Sørensen**). This amount of USD 2.6 m was paid in the period 1992-1996, so that in 1992 the Foundation paid the first instalment of USD 750,000 to LSV. In 1993 LSV applied for a transfer to another French association, LEE. The following payments were made to that association.

In addition, the Foundation decided in 1994, on the background of an application from LEE dated 2 October 1994, to grant USD 411,000 to the building of a power station at Fazenda Jatoba. This application and the subsequent reports from LEE are signed by **Lars Jensen**. In addition to these two primary grants the Foundation has also supported the project with USD 200,000 for completion and extension of the power station at the plantation and for payment of legal expenses, etc.

**5.3.3.2. The police investigation of the project**

The investigation has shown that Floryl Florestadora YPE S.A. is a *commercial enterprise, controlled by the defendants, where the profits accrue to LG's treasury*. The payments are therefore unlawful (not for a *"public utility"* purpose). The investigation has also shown that part of the funds allegedly paid to Floryl Florestadora YPE S.A. have been spent on other purposes.

**The purpose of purchasing the plantation**
The purpose of purchasing Fazenda Jatoba is described in a letter from **Amdi Pedersen** to **Kim Bonde Andersen** of 8 January 1993 (tab 8). It is not mentioned in this letter that the purpose of the purchase should be nature protection or research. It was clear to the Tvind management that there was no basis for producing electricity by means of biomass fuel for subsequent sale of this electricity, because the plantation is too far removed from urban areas to make this profitable. The purpose of the purchase seems to be that Amdi Pedersen wanted to establish a commercial plantation with a self-sustaining Tvind community on the estate. Therefore, Jatoba is intended to: Pay for its own operation, to contribute to LG's treasury, and to supply wood for sale through One World Entreprise, cf. more about this company in the following.

**The purchase of Floryl Florestadora YPE**
The project in Brazil is part of the total activities executed and managed by USS. On the list of LG activities (tab 42) Floryl appears as No. 232 and 233.

In June 1992, the company Tropical Farming Ltd. (**Kim Bonde Andersen**) initiated negotiations with Royal Dutch Shell about purchasing the 140,000 ha plantation Fazenda Jatoba, which is situated in the Bahia region in Brazil. **Tropical Farming Ltd.** is registered on Grand Cayman and owned by **DSI Estate** in Denmark. The company does not appear on the Group diagram for 1995.

During the negotiations with Shell, Kim Bonde Andersen has currently received instructions from "KLAP" and from the rest of the management of LG's economy. For instance, Amdi Pedersen (KLAP) decided the size of Tvind's offer. The deal was concluded on 3 December 1992, when the seller accepted an offer of USD 12 m (the actual sales contract is not included in the case). On 11 December 1992 a protocol of intent of the purchase was signed. On the same day the coming manager of the owner company, **Lars Jensen**, prepared an application to LSV for USD 2.5 million. On the same day LSV – also represented by Lars Jensen – applied to the Foundation for support to that amount, cf. the foregoing.

**Ownership of the receiving company**

The plantation in Brazil is owned by the company Floryl Florestadora YPE S.A. Until 1991 Royal Dutch Shell owned all the shares in this company. In 1992 LG's treasury purchased the company on direct instruction from the defendants **Amdi Pedersen** and **Kirsten Larsen.** This appears for one thing from Sten Byrner's letter of 3 December 1992, tab 6. The deal was completed by **Sten Byrner** and **Kim Bonde Andersen**, who in connection with the acquisition used a number of companies controlled by the defendants (cf. group diagram below).

The fact that via a number of front men and companies the defendants **Amdi Pedersen, Kirsten Larsen, Ruth Sejerøe-Olsen** and **Marlene Gunst** were in reality behind the purchase is confirmed by Amdi Pedersen's letter about replacement of the management (tab 28).

After the purchase, the ownerships were as follows, cf. also the group diagram on page 6:



At all times the defendants have attempted to conceal the ownerships of the plantation from the Danish authorities. It is demonstrated for example by the Department of Private Law's decision of 26 June 2001 that Poul Jørgensen had surrendered a document from which it appeared that "we", i.e. LG, bought Jatoba in 1992. It seems that this document was surrendered to the Directorate by a mistake. In any case the defendant Jørgensen attempted to remove it from the file of the authorities during a meeting

The defendants have also attempted to conceal that in a number of cases the text in the applications has been prepared in cooperation between the "applicant" and the chairman of the Foundation and the persons responsible for LG's economy. It also appears from a "list of assignments" prepared by Ruth Sejerøe-Olsen and Marlene Gunst that in connection with later applications – an application of 15 November 1998 – it lies with **Poul Jørgensen** to write the cover letters to be forwarded with the application to the Foundation. It appears from the examples in tab 19, tab 20, tab 22 and tab 23 that Poul Jørgensen also *de facto* has formulated both applications and letters to the Foundation, that is to Poul Jørgensen himself, concerning the project.

**The actual application of the funds of the Foundation:**

The funds for the purchase of Floryl Florestadora came from two sources: (1) From **Bahia Farming Ltd.**, which was a company newly established for the purpose under Fairbank, Cooper and Lyle. In connection with the purchase Bahia Farming received a number of transfers from a number of Tvind's companies and associations, including UFF/Humana, and from LG's treasury. (2) From **La Societé Verte**, which in turn was financed by Tvind's Humanitarian Foundation.

Regarding the application of the funds from the Foundation, it appears from the application of 11 December 1992 that the funds from the Foundation shall primarily appear (be entered) as a loan, whereafter the amount is to be converted into a donation to the company. Therefore it appears from the application (Exhibit 56-3-4-2 p. 18) that the first part of the grant – USD 750,000 – is to be spent on the purchase of the plantation, while the money for the following years is to be spent on support of the project, i.e. the protection of nature. The Foundation has also informed the authorities that the grant had the nature of a loan. This was observed by the chartered accountant of the Foundation, Erik Rømer Jensen, in 1998. In a letter of 6 April 1998 the accountant informed Poul Jørgensen that a loan could not result in tax deductions. At the same time the accountant suggested "renaming" of the payments to Floryl to a *"subvention with obligation of repayment in the form of royalty"*, cf. tab 18.

Preliminary investigation of the cash flows shows that a large part of the funds from the Foundation has been spent on down payment and current payments of options to the seller, and that the bulk of the amount paid - USD 1.4 m – has been spent on covering costs without any connection with a possible protection of nature at the estate. All transfers from LSV/LEE have been entered at the recipient – Floryl Florestadore - as "loans" or as "funds for future, additional capital". The reason behind these entries was that Tvind did not wish to pay tax of the money in Brazil, cf. tab 32.

The investigation has also shown that part of the funds paid to the Floryl project has been spent on quite different purposes.

Thus it appears from the documents under tab 27 that there is a discrepancy of USD 496,000 between the amount paid by the Foundation and the amount received in Brazil according to the books. The discrepancy is stated to be for example *"management fee"* and *"travel expenses"* in LEE totalling USD 325,000. Since LEE – as stated above – is a "brass plate company" without any form of operations, this is proof that these funds have been spent on other purposes. It appears from the same exhibit also that answers to questions from authorities are in reality prepared/constructed by others than the foundation management, *in casu* **Kirsten Fugisbjerg** (KF), and that the deficit in the books for 1995 is explained by expenditures allegedly effected subsequently.

It also appears from a draft for auditor's records for LEE of 1 July 1995 (tab 10) that in 1993 in connection with the project, loans have been granted to an amount of USD 176,000 to **Eastover Properties Ltd.** and **Furtherland**

**Farming Ltd.** These two companies are registered on Cayman Islands. It appears from the Group Survey, tab 43 p. 8 that Furtherland Farming is owned by **Kirsten Larsen** personally with 40% and by Cay Properties Ltd. by 60% - As per 1 September 1995 Kirsten Larsen owns Cay Properties with 96%. Correspondingly, Kirsten Larsen personally owns 98% of the parent company of Agricorp Ltd., which in turn owns Eastover Properties Ltd. In a letter of 6 May 1995 from Kirsten Fuglsbjerg to Poul Jørgensen (tab 10) it is stated that *"the section about Cayman [shall] be deleted"* from the auditor's records.

Finally it can be mentioned that it appears from the documents under tab 23 that an application from December 1998 for payment of USD 100,000 to the power plant at Jatoba is a fabrication. In reality the money was to be used as *"buffer in a mortgage payment to be made Wednesday"*.

### Operation of the enterprise

Until 2000 the plantation in Brazil was managed by **Lars Jensen**, who at the same time was chairman of LSV and LEE. This does not appear from the documents to which the authorities have had access. It appears from the dossier, tab 28, that on <u>19 September 2000</u> the defendants Pedersen and Larsen decided that due to unsatisfactory earnings on the estate, Lars Jensen was replaced as senior executive by **Søren Sørensen** (up to then head of LG's production enterprises in Belize).

In connection with a lawsuit concerning the construction of the power plant on the estate, **Poul Jørgensen** has acted as legal advisor for the owners of the plantations, cf. the dossier, tab 11. In this work Poul Jørgensen has also acted under instructions from LG's Economy (in casu Anne Hansen).

In 1999 the Danish tax authorities in cooperation with the local authorities carried out an investigation of the Floryl project. The Brazilian authorities concluded that the operation of the plantation was commercial, and that there had been no (or very little) planting of forest, citrus plantations, or other crops to replace the intense forest cutting at the plantation. Even though the enterprise might have developed and implemented a system for electricity production by exploiting felled wood (such as it is stated a.o. in the applications to the Foundation), everything indicates that the management on site has only maintained forest planting and felled trees that were ripe for this.

### Instructions concerning the operation:

It appears from a number of exhibits discovered in secured computers at Tvind that grants to the plantation are managed by **Ruth Sejersø-Olsen** and **Marlene Gunst**, but under instructions from Amdi Pedersen and Kirsten Larsen (KLAP). As mentioned, Amdi Pedersen has stated in a letter of 19 September 2000 that the purpose of LG's ownership is maintenance of the value of the estate and maintenance of the thinning out of the forest and controlling production profitability – and to cut and sell the trees when they are ready. Amdi Pedersen sets the goal that productivity must be increased by 200%, the wages must be cut by 62% of the present wages, the debt must be liquidated, and the accountancy must be revised so that *"one can see that there is a profit"*. The sale of wood from Fazenda Jatoba is partly effected under Amdi Pedersen's personal control through a company "One World Enterprise", which is responsible for wood export for furniture production in China.

### Conclusion

On the background of the foregoing there is probable cause to suspect that payments to the Floryl project have not actually been used for public utility purposes, let alone to "protection of the natural environment". Thereby the payments are unlawful, and deductions for allocations and provisions in the accounts of the Foundation have been made unlawfully.

## 6. Allocations to humanitarian purposes

### 6.1. Applications and grants:

This summary of the case does not comprise the grants from the Foundation in the period 1997-2000 for humanitarian purposes. These counts are – like the main part of the other counts – still being investigated, and therefore it cannot be excluded that in these more recent projects, humanitarian purposes have actually been subsidised.

Until further it is noted about these counts that in the period after 1997 the Foundation has preferably subsidised the "Federation" (UFF/Humana), and that the defendant Mogens Amdi Pedersen and the management of LG's Economy seemingly dictate the Foundation board these grants, which to a certain, as yet unclarified extent, are triggered by fictitious applications.

### 6.2. Police investigation of the projects:

Until further it is noted that also regarding payments to the Federation (UFF/Humana) there is a number of irregularities in the administration of the Foundation. For one thing it appears from Eva Vestergaard's letter of 3 January 1997 (tab 15) that Rikke (Viholm) is the person who applies to the Foundation on behalf of the Federation, and that her letters are to be written by others, because she is co-founder of the Foundation.

It appears from a number of other documents found by searching that the Federation makes substantial contributions to LG's treasury, and that trade in second-hand clothes is not in the nature of a humanitarian effort, but that the trade takes place "*on a commercial basis direct to LG's treasury*", cf. tab 29.

The investigation has also shown that at least USD 270,000 has been paid from the Foundation to the defendants Amdi Pedersen's and Kirsten Larsen's entire disposal under the pretext that it involved support to the fight against AIDS etc.in Africa.

It appears from the dossier, tab 31, that there is an e-mail message of 27 Februar 2001 from the defendants **Ruth Sejerøe-Olsen** and **Marlene Gunst** to the defendant **Poul Jørgensen** stating among other things:

"*We have talked to KLAP and agree with them. The Foundation grants USD 100,000. Today the Foundation has a total of 160,000 USD in cash. We make an application of USD 100,000 from TCE/the Federation for expenses in connection with publications and small experiments in connection with TCE. The money will be available on 1 March. We have written to Maria Darsbo: You must make an application to the Foundation now for the 100,000 USD. (...) You must agree with PJ how this must be formulated. And we would like you to make the application at once and send it to the Foundation by e-mail, so that they can have a meeting without delay. Preferably tomorrow evening, so that KLAP actually have the money made available*".

"TCE" is an abbreviation for "Total Control of the Epidemic", Tvind's anti-AIDS programme in Africa. Maria Darsbo is the senior executive of the Federation (UFF/Humana).

It also appears from an e-mail of 14 May 2000 from the defendants **Ruth Sejerøe-Olsen** and **Marlene Gunst** to the defendant **Poul Jørgensen**, that:

"*We are preparing a grant of USD 170,000 from the Foundation to the Federation. (..). When we have decided the contents of the application, the HQ or el e.advice will write it, and then the Foundation will have a board meeting, and the  money will then be paid. This means that in about a week the Foundation will pay USD 170,000 to the Federation* (the management of UFF/Humana (the author's note)) *Now you are warned. (USD 110,000 is for the federation, and USD 60,000  is for GAIA's containers, but we take it via the federation to spare the Foundation, and then it is between the Federation/Planet Aid and GAIA we create a relation – we take it that that is how you prefer it*".

The defendant Poul Jørgensen (and Dorthe Svendsen) replied to this message on 28 May, 2000, that "we" had received an application from the Federation, which was no good, but now another, much better had been received. The money was transferred to the Federation's account in BG Bank, Copenhagen, on 28 May, 2000.

The circumstances concerning 1997-2001 are still being investigated.

## 7. Conclusion

In all the counts described above the prosecutor finds that there is proof that the formal management of Tvind's Humanitarian Foundation acting on instructions from Mogens Amdi Pedersen (and Kirsten Larsen, who cannot be separated from Amdi Pedersen) has paid funds to purposes which are not of public utility, or which at the same time have the nature of support to humanitarian purposes, promotion of research or protection of the natural environment.

Thus it is a common feature for all projects from 1987 to now that no major decisions on the situation of the Foundation are made without "KLAP" being involved, and that Amdi Pedersen exercises his authority on the Foundation through "LG's Economy", i.e. in the period 1987-1992 via Sten Byrner and then Ruth Sejerøe-Olsen and Marlene Gunst.

The purpose of the payments has been to obtain an unwarranted gain for the defendants themselves or others – in the last resort a gain for the common economy in Tvind, "LG's treasury".

Payments to "promotion of research:"

The payments in 1987-1991 have been effected via IFAS, which is not – as represented by the defendants – really a research organisation. Thereby it can be assumed that the funds have been unlawfully paid, and the actual going over of the projects that have received subventions also demonstrates that no funds have been specifically spent on "research". On the contrary, all funds are going back into the LG treasury.

Payments to "support of the natural environment":

The payments 1992-1998 for nature purposes were effected via LSV and LEE, which are not in reality – as represented by the defendants – associations engaged in nature preservation. Thereby it can be assumed that the funds have actually been paid unlawfully, and the actual going over of the three projects described in this preliminary statement does not disprove the assumption.

**Count B.1.10:** The funds have been spent partly as capital for the USS-owned plantation in Malaysia, which is a commercial enterprise, partly on irrelevant purposes, including the purchase of flats in Miami and payment to Kirsten Larsen personally,

**Count B.1.9:** The funds have been spent on support of a single individual, Mr. Stein, who operates a commercial enterprise, and they have been transferred to the free disposal of the defendants,

**Count B.1.11:** The funds have been spent partly as a capital payment into the USS-owned plantation Fazenda Jatoba, which is a commercial enterprise, and partly on irrelevant purposes.

The funds in these counts have consequently not been spent on support of the natural environment, as stated to the authorities.

Payments to humanitarian purposes:

(Under investigation).

In all instances this case summary cites numerous pieces of evidence that in a large number of cases the defendants have prepared fictitious applications in order to conceal from both the Department of Private Law and the Customs and Tax Authorities that the funds of the Foundation are not spent within the legal area, and that the formal board of management of the Foundation does not make decisions concerning the application of the funds of the Foundation. On the contrary, the Foundation is managed by the defendant Amdi Pedersen.

Consequently the prosecutor also finds that there is probable cause to suspect that the defendants are guilty of embezzlement of the Foundation, and that the deductions in both the contributors' income (which are triggered by the approval of the Foundation pursuant to section 12(3) of the Danish Tax Assessment Act) and the deductions in the tax returns of the Foundation are incorrect, and that the whole operation is an expression of a tax construction built on incorrect, incomplete, or misleading information on the tax circumstances of both the contributors and the Foundation.

The Public Prosecutor for Serious Economic Crime<br>
The Chief Constable in Holstebro

Date: 29 November 2001
J.nr. SAØK 278/00 – PG